UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------
In re

      Charles L. Davis                                 Case No. 01-11678 K

                    Debtor
-----------------------------------------------------------------
LeRoi C. Johnson

                    Plaintiff

        -vs-                                 AP No. 01-1224 K

Charles L. Davis

                    Defendant
-----------------------------------------------------------------


LeRoi C. Johnson, Esq.
181 Franklin St., Suite 320
Buffalo, NY   14202


Plaintiff, pro se


Denis A. Kitchen, Jr., Esq.
8899 Main Street
Williamsville, NY   14221


Attorney for Debtor/Defendant



<u>DECISION AFTER TRIAL WITH OPINION AND ORDER</u>

      This is a dischargeability dispute arising out of a personal transaction between

two attorneys.  The following constitutes the Court's Rule 52 Findings of Fact, Conclusions of

Law, and Decision.

## FINDINGS OF FACT

1. The Plaintiff and the Defendant were attorneys practicing independently from each other for many years, and seemingly were friends.

2. In 1992, the Plaintiff sold his home to the Debtor for approximately $366,000. However, there was an existing mortgage on the property of approximately $53,000, which was deducted from the purchase price at closing, but not paid at that time.

3. It appears to have been understood between the parties that the Plaintiff would continue to make the payments on the $53,000 mortgage. (The Plaintiff sincerely believed, albeit wrongly, that only he could pay off that mortgage. Thus, he thought that its continued existence provided him with an added form of security over the Debtor's possible alienation of interests in the house.) Moreover, the balance of the purchase price was, in large part, in the form of a mortgage given by the buyer/Debtor to the Plaintiff/seller.[1]

4. The new mortgage instrument was not recorded. This was possibly in order to avoid the necessity of paying mortgage recording tax, and also might possibly have been to assist the buyer/Debtor by avoiding the necessity of a public record regarding this sizeable obligation. (As noted above, the two parties were, apparently well acquainted with each other, and apparently on friendly terms.)

5. There came a time in 1996 when the Debtor was in default on the mortgage to

---

[1]It is undisputed that, through inadvertence, the new mortgage instrument was written incorrectly. It listed the seller/Plaintiff as the mortgagor and the buyer/Debtor as the mortgagee. This was corrected in later litigation, which will be discussed below.

the Plaintiff. The Plaintiff commenced an action and also obtained provisional relief in the form

of an Order preventing the alienation of the property. He also filed a *lis pendens*.

6. It is marginally important to note that an unrecorded purchase money

mortgage primes certain subsequent non-purchase money liens, under New York Law. It is also

marginally important to note that although the recordation of a *lis pendens* places a potential

purchaser or lienor on notice of the existence of a dispute regarding the property, it does not

block alienation of the property, under New York Law; rather, it simply implicates provisions of

New York Law that limit the right of subsequent purchasers or encumbrancers "with notice," as

opposed to subsequent purchasers or encumbrancers "without notice," of a prior adverse claim to

the property.

7. The Debtor denies having had any awareness of the Court Retraining Order

during the time periods that are material to the present litigation, but, for reasons stated below,

this Court will not credit that denial.

8. After the entry of the Order of Restraint, and during the pendency of the 1996

litigation, the Debtor arranged to borrow a substantial amount of money from an out-of-state

lender. It is not clear, however, when the Debtor actually received the funds. This is important

because the Debtor claims that removal of the *lis pendens* was essential to his ability to obtain or

use those funds. But, on the other hand, there are indications that the Debtor was using those

funds before there was any release of the *lis pendens*. One specific indication is the fact that the

Debtor used a check drawn on that lender's account in his effort to settle the 1996 litigation, in

1997, by which he would <u>obtain</u> release of the *lis pendens*.

9.    The Court *sua sponte* takes judicial notice of the fact that although it is rare for a lender to advance funds on a secured loan before title has been cleared to the collateral, it does sometimes happen.  It happens sometimes when the lender has not performed appropriate due diligence before extending the funds; several times before this Court, a lender did not have an appropriate title search conducted before advancing the funds.   It also happens in some situations where an attorney agrees to hold the funds in escrow or other trust until he or she has made the necessary disbursements to clear title but does not do so (and it is to be remembered that although the Debtor was the borrower, he also was, at the time, a licensed attorney).  And it also happens in instances in which the lender has a long-standing relationship with the borrower, such that the lender is willing to trust the borrower's promise to make the necessary disbursements that will clear title to the collateral.  (This writer has seen one or more illustrations of this last point where the lender is a credit union that is refinancing on the automobile of a borrower who has been a long-standing member of the credit union, and the borrower has been entrusted to pay off the existing loan and to mail all the requisite lien papers to the State for the credit union's benefit.)

10.    The 1996 litigation was settled in State Court on April 28, 1997.  It appears clear (and the Court finds) that neither the Plaintiff nor the judge who approved the settlement was aware that the Debtor had already borrowed against the house in violation of the State Court's Restraining Order.  (It is clear that by the time that that settlement was reached, the Debtor had become aware of the Restraining Order, because in the meantime he had sought to dissolve it, and that request had been denied.)  This breach of the State Court Order constitutes a

wilful and malicious injury under 11 U.S.C. § 523(a)(6), as discussed below.

   11.  At some point prior to the 1997 settlement, (though the Court does not know when that occurred), the Plaintiff became aware that his own relatively-small mortgage to a traditional lender had been paid off by the Debtor.  This was distressing to the Plaintiff because he believed (mistakenly, as it turns out) that it was his right and his right alone to decide to satisfy that pre-existing mortgage, and he believed that by making payments on that mortgage and keeping it in existence, that mortgage would provide him with added assurance that the Debtor could not alienate the house or any interest in it without the Plaintiff's permission.  (Of course, under State Law, the owner of real estate or any other collateral has an absolute right (absent some express contractual obligation) to pay off any pre-existing encumbrance with or without permission of the original encumbrancer, and indeed must often do so in order to refinance or sell the collateral.)[2]

   12.  In the April, 1997 Court-approved settlement, the mortgage defaults were addressed in the following manner: the Debtor paid $127,000 to the Plaintiff in the form of a check drawn on the account of the out-of-state lender, gave a $25,000 post-dated check to the Plaintiff that was to be cashed on May 12, 1997, and also gave a $4600 post-dated check to the Plaintiff that was to be cashed on May 28, 1997.  Most importantly, the Debtor gave a promissory note to the Plaintiff for $53,000 that would fall due on October 20, 1997.  In return, the Plaintiff released the *lis pendens* and discontinued the suit.

---

[2]Neither the Plaintiff nor the Debtor were real estate attorneys.  Rather, for the most part, they were personal injury attorneys.  This might explain some of the irregularities and misunderstandings involved in their personal transactions, such as the mortgage instrument that was written "backwards," as described above.

13.  Both of the post-dated checks initially bounced, but they were later made good, leaving only the $53,000 promissory note.  The promissory note itself was not secured by a mortgage.  Furthermore, the promissory note did not contain any statement of remedies for default, but rather stated only a new, higher interest rate that would apply thereto after the due date of October 20, 1997.

14.  When the promissory note was not paid on October 20, 1997, the Plaintiff agreed to extend it, at the higher interest rate, to October 10, 1999 (two years later).

15.  The Plaintiff's testimony at trial here is emphatic that he was completely unaware at the time of the settlement (which incorporated the release of the *lis pendens*) that the Debtor had already borrowed sufficient funds from the out-of-state lender to satisfy the claims of the Plaintiff in an amount and time frame that would have been more favorable to the Plaintiff. The Plaintiff is emphatic that had he known that, he would not have taken the post-dated checks (which were later made good) or, most importantly, the $53,000 promissory note.  Rather, he may have demanded the full amount he was owed (though possibly forgiving overdue interest, as he was already doing in the settlement that was approved) in order to settle the matter once and for all.

16.  For his part, the Defendant makes much of the fact that the $127,000 check that he gave to the Plaintiff at the April, 1997 settlement was drawn on the account of the out-of-state lender.  This, the Debtor argues, should prove that the Plaintiff was aware of the fact that the Debtor had already borrowed against the house.  The Plaintiff counters, and the Court agrees, that the Plaintiff would have no reason to believe that the source of the funds had anything whatsoever

to do with the home.  It might simply have been a payment in satisfaction of a pending legal

matter in which the Debtor was acting as an attorney, perhaps for that out-of-state lender.

Furthermore, as noted above, this check appears conclusively to establish that the Debtor obtained

the money from that lender <u>before</u> title was cleared by release of the *lis pendens*.

      17.  When the Debtor did not pay the $53,000 note on the extended due date (in

1999) the Plaintiff commenced suit again.  In that suit, the Plaintiff sought to set aside the

previous settlement, restore all of the past due interest, costs, attorneys fees he had himself

incurred by hiring other counsel, etc.  Essentially he was able to roll the clock back to the original

mortgage default in 1996.  He prevailed, and when all of those things were added back in, he won

a judgment against the Debtor which, after the Debtor's failed appeal, left an amount due by the

Debtor to the Plaintiff of $503,000.

      18.  The Debtor filed his Petition in this Court in 2001, originally under Chapter

13, then under Chapter 11, and then converted by the Court to a Chapter 7.  After that initial

filing,  the Court had granted leave to the Plaintiff to liquidate his claims against the Debtor in

State Court.  (The Court had no idea, at that time, what the basis was of the Plaintiff's claims

against the Debtor.[3] Under the case of *Andrijevic*, the Plaintiff's claim in this case must be

allowed in that amount.  *Kelleran v. Andrijevic*, 825 F.2d 692 (2d Cir. 1987).  But allowance and

dischargeability are different issues.

      19.  Since this case was converted to Chapter 7 in 2002, the Debtor has remained

---

[3]For all the Court knew, the claim arose out of a co-counsel relationship in a personal injury case.  As so the Court was happy to let the claim be reduced to a final judgment in State Court.

so uncooperative with the Chapter 7 Trustee that he has been referred to the United States

Attorney at least twice for bankruptcy crimes (which were never prosecuted, to the best of this

Court's knowledge). It was only through Restraining Orders obtained by the Trustee in numerous

other Courts that the Trustee was able to obtain some funds (about $60,000) that the Debtor

would have diverted from the estate, arising out of settlement or other resolution of legal matters

in which the Debtor was counsel (with the exception of some monies that the Trustee was able to

learn of through the Debtor's son, who has since become an attorney and who took over some of

his father's cases, and has been fully co-operative). The Debtor, as a result of his violations of

this court's and other courts' orders, has lost or surrendered his right to practice law, at least on a

temporary basis.

      20. According to the Debtor at trial here in this Court, he has now paid off all

other creditors except the Plaintiff, apparently using at least some of the monies that should have

been turned over to the Chapter 7 Trustee.[4]  Consequently, the Plaintiff is not only the <u>largest</u>

creditor of the Debtor, at this point, but the <u>only</u> creditor of the Debtor at this point, apart from

Trustee costs and expenses.[5]

      21. This 11 U.S.C. § 523 Complaint was filed by the Plaintiff shortly after the

---

[4]The Court and Trustee referred the Debtor to the then U.S. Attorney for criminal investigation, but there was no prosecution. (Perhaps there was a Grand Jury that would not indict. The Court is not privy to such sealed information.) In essence, the Debtor got a "pass" to keep stealing from the estate.

[5]At some point in the course of this Chapter 7 case, it was apparent that the "laboring oar" in attempting to uncover assets of the Debtor had become the Plaintiff, and , consequently, he too was appointed special counsel to the Trustee (the Trustee had other special counsel as well), and consequently has administrative expense claims against this estate, for the work that he has done towards furthering the work of the Chapter 7 Trustee.

Debtor filed his petition in 2001. The Complaint is, consequently, nine years old, and much of what is recited above was not known to the Plaintiff, the Trustee, or the Court, when the Dischargeability Complaint was filed. The Complaint appropriately alleged, as its bases, all three relevant subsections of 11 U.S.C. § 523 - - (a)(2) dealing with fraud, (a)(4) dealing with fiduciary fraud, and (a)(6) dealing with wilful and malicious injury. After trial, the Plaintiff moved to add a § 727 cause of action. With the very recent arrival of a lawyer to represent the Debtor, however, the case was prepared and tried only on § 523 grounds, and the Plaintiff's effort at the end of trial to invoke § 727 was opposed by the Debtor, through counsel.

23. Consequently, the Court has taken the Plaintiff's Motion under submission, and considers the matter at this time only on § 523 grounds.

## CONCLUSIONS OF LAW AND DISCUSSION

Clearly, had this case played out in a different way, it would have resulted in a 11 U.S.C. § 727 Complaint by the Trustee or others, and possibly would have resulted in a denial of discharge,[6] but the fact that all other creditors have been improperly paid by the Debtor with funds that he should have turned over to the Trustee, and there has been pending, for a long time, a § 523 cause of action by the only remaining creditor, that scenario did not play out. The present Complaint would have been mooted by denial of discharge.

_____

[6]During the case, the Debtor suffered a debilitating stroke. Though, thankfully, his mental functions seem fine, his physical functions are not. (He was a star, decorated, local athlete, in his youth.)

In the Debtor's closing argument, his counsel appropriately argued that at one point, the amount in controversy in this case was $53,000. If the $53,000 note had been timely paid, with the appropriate interest, the matter would have been done back in 1997. And so, he argues, how could there be a judgment that the entire $503,000 State Court judgment is non-dischargeable even if one were to presume, for the sake of argument, that there was any fraud or wilful and malicious injury in connection with the 1997 settlement that yielded the $53,000 note that remained unpaid.

The Plaintiff responds that had there been no violation of the State Court Restraining Order, and had he known all of the pertinent facts in connection to that violation, and all of the facts surrounding the ability of the Debtor to make a settlement offer in 1997, he would not have agreed to the terms of the settlement, and might have demanded everything he was owed as of that point, including the accrued interest that he forgave in the earlier and later settlement. He also argues that he incurred substantial expense in pursuing the Debtor since the default on the $53,000 note. He had to sue again, move to set aside the earlier settlement, obtain a judgment for every penny he was owed, and, having prevailed on all of that, he had to defend against the Debtor's appeals of that judgment. In the meantime, the mortgage to the out-of-state lender has been recorded, and he has no resort to the house toward satisfaction of what he is owed. (In fact, to the best of the Court's recollection, the house has subsequently been sold to disinterested third parties.)

The Statute itself offers little guidance. 11 U.S.C. § 523(a)(2), dealing with fraud, states that a debt arising from fraud is not dischargeable only "to the extent obtained" by fraud.

The words "to the extent" do not appear under either § 523(a)(4) or (a)(6).

Furthermore, the highest court of the land has stated (in the case of *Cohen v. de la Cruz,* 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1988) that when a debt is declared non-dischargeable under 11 U.S.C. § 523(a)(6), it is <u>all</u> of the losses suffered as a result of the egregious conduct, that must be declared non-dischargeable, if such losses are allowable under non-bankruptcy law, and this has been construed to include, in appropriate cases, the attorneys fees incurred in obtaining the judgment of non-dischargeability in the Bankruptcy Court litigation. *In re Behn,* 245 B.R. 444 (Bankr. W.D.N.Y. 2000).

But before getting to that question, it must first be determined whether any of the damages suffered by the Plaintiff were a consequence of conduct of the Debtor that gave rise to a debt that is non-dischargeable under law.

In this regard, the Court has very little difficulty. In the case of *Bonnie Behn*, this Court set forth, in great detail, the reasons why the violation of a Court Order can constitute a "wilful and malicious injury" under § 523(a)(6), no matter how well-motivated the violator might have been. *Buffalo GYN Women Services, Inc. v. Bonnie D. Behn (In re Behn)*, 242 B.R. 229 (Bankr. W.D.N.Y. 1999) [Behn I].

The Court does not know whether the violation began before or after the Debtor admitted knowledge of the Restraining Order as a matter of record. But at some point he did so know, for he sought to dissolve it (without success). In any event, that effort preceded the April, 1997 settlement of the action. Repeating the above, if the Debtor had petitioned the Court (again) to dissolve the restraint, and fully recited the fact that his intention was to borrow a great deal of

money against the house in order (at least in part) to settle his dispute with the Plaintiff, the

Plaintiff would have been on notice of the Debtor's intentions, and would have conducted himself

accordingly in the settlement negotiations. Certainly, he would have demanded more immediate

payment in settlement, had he known the amount of credit available to the Debtor.

This Court has often ruled that where a <u>fiduciary</u> relationship exists between the

Debtor and the Creditor, the inability to decide with certainty what the Plaintiff's damages might

have been had the obligation of trust been honored, benefits the Plaintiff, and not the Defendant

whose breach of fiduciary obligation has rendered the computation of damages impossible. See,

for example *Gregory Rowe v. William Reynolds (In re Reynolds)*, Bk. No. 92-10856; AP No. 92-

1168. This is also true in cases of intentional tort, in which cases the uncertainties in the

computation of damages do not bar an award that is speculative, so long as it is not without a

reasonable foundation in evidence. (See, for example *Young v. Czechowicz (In re Czechowicz)*

Bk. No. 02-17497; AP No.03-1086.) Affd. *In re Czechowicz*, 2008 WL 728458 (W.D.N.Y.)

This case does not seem to involve a fiduciary relationship, nor does it seem to

establish the five traditional elements of fraud. Rather, this appears to be more similar to the

*Behn* case, involving willful disobedience of a Court Order, thus constituting a wilful and

malicious injury under § 523(a)(6).

In the *Behn* case, contempt sanctions for intentional disobedience of the Court

Order were fixed by the United States District Court at a certain amount. That is the amount that

was found non-dischargeable in the case of *Behn I*. In *Behn II*, *(In re Behn*, 245 B.R. 444 (Bankr.

W.D.N.Y. 2000)) attorneys fees were added to that judgment of non-dischargeability.

In this case, the damages resulting just from the intentional disobedience of the Court Order have not specifically been determined by any Court. Consequently, we return to the question asked at the outset, of how what had at one point in time been a $53,000 dispute is now a $503,000 dispute.

## CONCLUSION

The Court has been provided with no State Court record or written opinion from which it could be determined, with specificity, what portion of the $503,000 claim derived solely from the "wilful and malicious injury" that was the breach of the State Court's restraining order. The best evidence thereof, in the record before this Court is the Plaintiff's own statement that if he had known that the Debtor was borrowing against the house, he would not have agreed to two post-dated checks and a $53,000 note. He rather would have insisted upon cash.

Consequently, the Court rules as follows. The Plaintiff has a $503,000 allowable, pre-petition unsecured claim.[7]

Further, portions of that claim that will not be paid from this estate are not discharged: (1) interest at the lawful rate on the post-dated checks up until the time they were paid, (2) the $53,000 note that was never paid, (3) interest on that note until it is hereafter paid, (4) a pro-rata share of the portion of the $503,000 judgment that represented the fees, costs and

---

[7]This is independent of his administrative claim as special counsel to the Trustee. He shall share with the Trustee and other administrative expenses, *pro rata*, so far as the estate can hear such expenses.

expenses of obtaining that judgment and sustaining it through the appeals, and (5) the costs and

expenses of this Adversary Proceeding.

        Plaintiff shall compute the total non-dischargeable amount, as above and move for

entry of money judgment thereupon.

        Finally, appealable judgment shall not enter until after hearing on that motion.

        SO ORDERED.

Dated:      Buffalo, New York
            May 12, 2010

                               s/Michael J. Kaplan
                          _____
                                   U.S.B.J.